1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11  CARL ANTHONY STEPHENS,           )     NO. EDCV 09-00191 SS
                                     )
12                  Petitioner,      )
                                     )
13           v.                      )     **MEMORANDUM DECISION AND ORDER**
                                     )
14  KELLY HARRINGTON, Warden,        )
                                     )
15                                   )
                    Respondent.      )
16  _____)

17

18                              **I.**

19                          **INTRODUCTION**

20

21       On June 1, 2009, Carl Anthony Stephens ("Petitioner"), a California

22  state prisoner proceeding pro se, filed a Second Amended Petition for

23  Writ of Habeas Corpus by a Person in State Custody (the "Petition")

24  pursuant to 28 U.S.C. § 2254.   On July 15, 2009, Respondent filed an

25  Answer to the Petition (the "Answer"), as well as a memorandum of points

26  and   authorities   in   support   of   the   Answer   (the   "Answer

27  Memo").   Respondent lodged ten documents from Petitioner's state

28  proceedings, including the Clerk's Transcript ("CT") and the Reporter's

Transcript ("RT").  On November 20, 2009, Petitioner filed a Reply to the Answer.  The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  For the reasons discussed below, the Petition is DENIED and this action is DISMISSED WITH PREJUDICE.

## II.

### PRIOR PROCEEDINGS

On September 25, 2006, a jury in the Riverside County Superior Court convicted Petitioner of the following crimes:  attempted murder of Dexter Gant (count 1); assault with a deadly weapon of Dexter Gant (count 2); attempted murder of Rafael Gutierrez (count 3); assault with a deadly weapon of Rafael Gutierrez (count 4); and attempted escape from a detention facility (count 5).  (CT 196-99, 265-69).  The jury also found true allegations that Petitioner personally used a deadly weapon in the commission of his crimes in counts 1 and 3 and that Petitioner personally inflicted great bodily injury in the commission of his crimes in counts 3 and 4.  (CT 276, 278-80).  On January 26, 2007, the trial court imposed an aggregate sentence of twelve years and four months in state prison.  (CT 305-06, 328).

On July 29, 2008, the California Court of Appeal affirmed the trial court's judgment in reasoned decision. (Lodgment 8, Unpublished Opinion of the California Court of Appeal ("Lodgment 8")).  Petitioner subsequently filed a petition for review in the California Supreme Court, which was denied on November 12, 2008, without comment or

1   citation to authority.  (Lodgment 9, Petition for Review ("Lodgment 9");
2   Lodgment 10, California Supreme Court Order ("Lodgment 10")).

3

4       Petitioner thereafter filed a habeas petition in this Court on
5   January 29, 2009, and a separate habeas petition in the Southern
6   District of California on January 23, 2009, which was subsequently
7   transferred to this Court.  On March 16, 2009, the Court consolidated
8   the two habeas petitions and dismissed the action with leave to file a
9   second amended petition containing all of Petitioner's habeas claims.
10  On June 1, 2009, Petitioner filed a Second Amended Petition, which the
11  Court addresses, below.

12

13                              **III.**

14                      **FACTUAL BACKGROUND**

15

16      The following facts, taken from the California Court of Appeal's
17  unpublished decision, have not been rebutted with clear and convincing
18  evidence and must, therefore, be presumed correct.  28 U.S.C. §
19  2254(e)(1).

20

21  A.   Prosecution

22

23       1.   Attempted Murder and Assault With a Deadly Weapon
24            of Dexter Gant

25

26      On August 8, 2005, Dexter Gant[FN2] lived at 541 Barka
27  Creek Drive in Perris. [Petitioner] had lived in Gant's

28

                              3

neighborhood for at least 10 years.  Gant was separated from his wife and was renting a room to [Petitioner].

> [FN2]  Gant did not want to testify and had to be subpoenaed to testify.  He ignored the subpoena and was taken to jail.

That day, when Gant arrived home from his job at a telephone company, [Petitioner] and Gant smoked marijuana together (as they oftentimes did) in the garage. [Petitioner] told Gant that someone was looking for Gant or out to get him, but did not say whom.  [Petitioner] seemed to be acting different after he smoked the marijuana.

[Petitioner] went inside the house.  Suddenly, Gant felt something hit him in the head.  He felt something hit him all over his body.  Gant then realized it was [Petitioner] hitting him.  Gant did not feel any cutting, but saw something that looked like a wire splicer or "cable knife," that he used to cut wires at his work in [Petitioner's] hand. [Petitioner], who looked "crazy," told Gant to get out of there.

Gant ran to a neighbor's house.  For the first time, Gant realized he was bleeding and his neighbors gave him a towel to wipe up the blood.  Gant observed [Petitioner] run down the street away from his house.

Gant suffered three cuts on his right arm, a cut on his hand, and one on his neck.  Although Gant did not think he needed to go to the hospital, his friends and neighbors convinced him to go.  At the hospital, Gant received two or three stitches on his arm and hand.  Gant told an officer that interviewed him at the hospital that he did not want to press charges against [Petitioner], although he admitted that [Petitioner] caused his injuries.

Gant was transferred to another hospital to have more extensive testing on the cut on his neck.  There was evidence of injury to his carotid gland (which aids in digestion), but surgery was not necessary.  There were minor injuries to his carotid artery.  Gant stayed in the hospital for observation for two days.  Gant eventually received stitches on the cut on his neck.

2.   <u>Attempted Murder and Assault With a Deadly Weapon of Rafael Gutierrez</u>

On August 9, 2005, at about 9:00 p.m., Gutierrez went to Craig Stephens, Jr.'s ([Petitioner's] brother) mobile home, which was located on Cajalco Road in Perris, to discuss buying some pit bull puppies.[FN3]  Stephens, Jr. lived in a mobile home on a large piece of property owned by his and [Petitioner's] father, Craig Stephens, Sr.  There were multiple occupied and unoccupied mobile homes and/or recreational vehicles (RV) on the property.  Stephens, Jr.

had not seen [Petitioner] on the property that day and he was not living on the property at the time.

    [FN3]   Gutierrez had a prior misdemeanor theft conviction and a felony grand theft automobile conviction.

Gutierrez arrived and knocked on Stephens, Jr.'s door. When Stephens, Jr. did not answer, Gutierrez went back to his vehicle to wait for him.[FN4]   Gutierrez had his driver's side window halfway down. As Gutierrez was waiting in his truck, [Petitioner] approached him, walking from an old RV that was on the property. [Petitioner] told Gutierrez that Stephens, Jr. was not home and that he should leave. Gutierrez told [Petitioner] that he had spoken with Stephens, Jr. and that he was going to wait.

    [FN4]   Stephens, Jr. testified at trial that he was home and met with Gutierrez that night.

[Petitioner] walked away and went back in the RV. [Petitioner] came back from the RV and punched toward Gutierrez's driver's side window with his hand. [Petitioner's] hand hit the window, but he still was able to punch through to hit Gutierrez on the left side of his neck. Gutierrez did not see a knife in [Petitioner's] hand, but immediately started bleeding from his neck.

6

Gutierrez blacked out for about 30 seconds.  When he came to, [Petitioner] was still standing by the car. Gutierrez immediately drove off in his car to a nearby Circle K convenience store.  When he got to the Circle K, he pulled out the tip of the knife that had lodged itself in his neck. Gutierrez believed that the blade was five inches long.

Riverside County Sheriff's Deputy Sam Morovich was the first to arrive at the Circle K.  Gutierrez approached him crying, asking for help, and bleeding from his neck. Gutierrez was holding the knife blade in his hand.  It was "small and skinny" and probably one or one-half inches long. The blade was placed on his patrol car.  The knife blade was lost and not booked into evidence.

Deputy Paul Sandoval also responded to the 911 call. When he arrived, he contacted Gutierrez, who was holding a bloody T-shirt to his neck.  Gutierrez was taken away in an ambulance.

Deputy Sandoval drove to the property where Gutierrez indicated he had been stabbed.  [Petitioner] was not at the location.  After hearing that Gutierrez had been stabbed, Stephens, Jr. searched the property, but did not find [Petitioner] or anyone else.

Gutierrez was treated at Riverside Regional Medical Center.  Gutierrez did not require surgery on the neck wound

7

as there was no damage to his windpipe.  He received two stitches and was sent home.

The following evening, August 10, 2005, [Petitioner] was apprehended.  A stainless steel steak knife with a black handle was found in his front pocket when he was arrested.

[Petitioner] was interviewed at the police station. [Petitioner] claimed that the day before he was sleeping in his motor home when someone entered and assaulted him.  The person hit him over the head with a bottle.  [Petitioner] grabbed a knife and stabbed the person in the neck with a knife.  [Petitioner] did not know the person who attacked him.  [Petitioner] had no marks, bruises or cuts on his body when he was arrested.

3.  Escape from Custody

On August 17, 2005, Riverside County Sheriff's Deputies Robert Watkins and Wayne Tillett were working as correctional deputies at the Robert Presley Detention Center.  At approximately 1:00 a.m. on that day, they received a call that an inmate named Arturo Tellez was to be sent down to the release area because he was being released.  [Petitioner] was Tellez's cell mate.[FN5]

8

[FN5] The unit on which [Petitioner] and Tellez were housed was for mentally disabled or handicapped inmates who needed psychiatric medication.

Deputies Watkins and Tillett called into the cell through the intercom system.  They asked for Tellez and a male voice responded.  Believing it was Tellez, they told the person to gather his belongings and come down for release.

[Petitioner] came and met Deputies Tillett and Watkins; they believed that he was Tellez.  [Petitioner] was not wearing his prison issued wristband, which would have contained his photograph, booking number, date of birth, and name.  [Petitioner] told them that he lost it.  [Petitioner] was carrying property that had Tellez's name on it.

Deputy Watkins obtained a card from the office that had Tellez's picture.  Although [Petitioner] looked different from the picture, Deputy Watkins could not be sure.  Deputy Watkins gave the card to [Petitioner].  [Petitioner] was sent down to release.

Deputy Robert Mills was in the release area. [Petitioner] told Deputy Mills that he was Tellez.  Deputy Mills instructed [Petitioner] to grab his property bag from a row of bags that contained property from when the inmates were booked into jail.  [Petitioner] grabbed the one with Tellez's name on it.  [Petitioner] was instructed to change

9

back into his civilian clothing.  Deputy Mills then went to his supervisor, Deputy Perry Sexson, and informed him that they may have the wrong inmate because he did not match the picture on the card.

Deputy Sexson went to the changing area and asked for Tellez.  [Petitioner] responded, "That's . . . me." [Petitioner] was in Tellez's clothes, but had not put on the shoes.  When Deputy Sexson asked [Petitioner] why he did not put on the shoes, he responded that his feet had grown.

Deputy Sexson asked [Petitioner] background information for Tellez.  [Petitioner] said his name was Arturo Tellez and gave Tellez's correct date of birth.  He could not provide any other information.  Deputy Sexson then asked [Petitioner] to give his real name.  At first he stated he was Tellez, but finally admitted who he really was.  [Petitioner] just shrugged his shoulders when Deputy Sexson asked him why he was pretending to be Tellez.

Deputy Sexson talked to another deputy, Deputy Ferguson,[FN6] after the incident.  He did not recall telling Deputy Ferguson the statement [Petitioner] made about not putting on the shoes.

[FN6]  Deputy Ferguson's first name does not appear in the record.

B.    <u>Defense</u>

The trial court took judicial notice of the fact that the moon was at 19 percent of full capacity on August 9, 2005, the night that Gutierrez was stabbed.

Deputy Sandoval was recalled and testified that Gutierrez (who identified himself as Rodriguez) told him at the Circle K that he had been at the Perris property to visit Stephens, Sr. As he approached the front door, a male adult asked him what he was doing there. Gutierrez did not respond. Gutierrez then started back to his truck. The male adult then stabbed him in the neck. Gutierrez ran back to his truck and drove away.

(Lodgment 8 at 3-9).

**IV.**

**PETITIONER'S CLAIMS**

In the Petition, Petitioner raises five grounds for federal habeas relief. First, Petitioner contends that the trial court erroneously allowed into evidence a knife found in his possession when he was arrested in violation of California Evidence Code section 1101 and Petitioner's Fourteenth Amendment right to equal protection. (Petition at 5). Second, Petitioner contends that the trial court limited his defense by erroneously excluding testimony from defense witnesses in violation of his rights under the California Constitution and the

11

Fourteenth Amendment. (Id.). Third, Petitioner contends that the trial court failed to instruct the jury on simple assault in violation of the California Constitution and his Fourteenth Amendment rights to due process and equal protection. (Id. at 6). Fourth, Petitioner contends that the trial court refused his request for a self-defense instruction in violation of his Fourteenth Amendment right to equal protection. (Id.). Fifth, Petitioner contends that the trial court erroneously gave a flight instruction to the jury in violation of the Fourteenth Amendment. (Id.).

## V.

### STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which effected amendments to the federal habeas statutes, applies to the instant Petition because Petitioner filed it after AEDPA's effective date of April 24, 1996. Lindh v. Murphy, 521 U.S. 320, 336, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997). "By its terms [AEDPA] bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." Harrington v. Richter, __ U.S. __, 131 S. Ct. 770, 784, 178 L. Ed. 2d 624 (2011). Pursuant to 28 U.S.C. § 2254(d)(1) and (d)(2), a federal court may only grant habeas relief if the state court adjudication was contrary to or an unreasonable application of clearly established federal law or was based upon an unreasonable determination of the facts.

AEDPA limits the scope of clearly established federal law to the holdings of the United States Supreme Court as of the time of the state court decision under review. Lockyer v. Andrade, 538 U.S. 63, 71, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). Circuit precedent is relevant under AEDPA when it illuminates whether a state court unreasonably applied a general legal standard announced by the Supreme Court. See Crater v. Galaza, 491 F.3d 1119, 1126 n.8 (9th Cir. 2007).

To the extent that Petitioner's federal habeas claims were not addressed in any reasoned state court decision, however, this Court conducts an independent review of the record. See Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002). In such circumstances, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Richter, 131 S. Ct. at 784.

Here, Petitioner generally raised all of his claims before the California Court of Appeal on direct review and before the California Supreme Court in his petition for review, (Lodgment 5, Appellant's Opening Brief ("Lodgment 5") at 21-41, 47-54; Lodgment 9 at 15-33, 35-37), though he explicitly invoked the United States Constitution only with respect to his claim in Ground Two. (Lodgment 5 at 30-31; Lodgment 9 at 22-27). After the California Court of Appeal affirmed the judgment in a reasoned decision, the California Supreme Court denied Petitioner's petition for review without comment or citation to authority. (Lodgment 10). The Ninth Circuit has held that the California Supreme Court's silent denial of a petition for review satisfies the exhaustion requirement. See Williams v. Cavazos, 646 F.3d 626, 637 n.5 (9th Cir. 2011). However, the Ninth Circuit explained that the silent denial of

13

1  a petition for review is "not a decision on the merits" and that federal

2  habeas courts must "look through" the silent denial to the last reasoned

3  state court decision.  <u>Id.</u> at 636.  The last reasoned state court

4  decision here is the opinion of the California Court of Appeal.

5

6      After reviewing the record, the Court concludes that Petitioner

7  failed to assert a federal constitutional violation when he presented

8  Grounds One, Three, Four, and Five on direct appeal.  Accordingly, these

9  four claims are unexhausted.  (<u>See</u> Answer Memo at 4-6, 15-16).  As a

10 result, the California Court of Appeal did not have an opportunity to

11 "adjudicate on the merits" Petitioner's constitutional claims alleged

12 in these grounds.[1]  Nevertheless, because the outcome will be the same,

13 the Court exercises its discretion to address the merits of these

14 unexhausted claims.  28 U.S.C. § 2254(b)(2).  Accordingly, the Court

15

16

17 _____

18      [1]  The California Court of Appeal arguably viewed Petitioner's claim
   of instructional error as alleged in Ground Four as a violation of the
19 United States Constitution based on the court's application of the
   harmless-beyond-a-reasonable-doubt standard under <u>Chapman v. California</u>,
20 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), upon concluding
   that the trial court erroneously refused to give a self-defense
21 instruction. (Lodgment 8 at 28-29).  <u>See</u> <u>Medina v. Hornung</u>, 372 F.3d
   1120, 1124-25 (9th Cir. 2004) (noting that state courts may dispose of
22 most claims of constitutional error by applying the <u>Chapman</u> standard of
   harmless error); <u>see also</u> <u>Early v. Packer</u>, 537 U.S. 3, 8, 123 S. Ct.
23 362, 154 L. Ed. 2d 263 (2002) (per curiam) (holding that a state court
   need not cite or even be aware of federal precedent, "so long as neither
24 the reasoning nor the result of the state-court decision contradicts
   them").  However, because Petitioner did not explicitly contend on
25 direct appeal that the trial court's error as alleged in Ground Four
   resulted in a violation of the United States Constitution, (<u>see</u> Lodgment
26 5 at 50-54), this Court will presume, out of an abundance of caution,
   that the California Court of Appeal did not adjudicate the federal claim
27 on the merits.

28

will apply <u>de novo</u> review to Grounds One, Three, Four, and Five.  <u>See</u>
<u>Williams</u>, 646 F.3d at 641.[2]

    The California Court of Appeal did, however, address Petitioner's
federal constitutional claim in Ground Two.  (Lodgment 8 at 17-18, 27-
29).  Thus, the Court concludes that the California Court of Appeal
"adjudicated on the merits" Petitioner's claim in Ground Two.
Accordingly, the deferential standard of review contained in section
2254(d)(1) and (d)(2) applies.[3]  <u>See Richter</u>, 131 S. Ct. at 784.

**VI.**

**DISCUSSION**

**A.    <u>Petitioner Is Not Entitled To Habeas Relief On His Claim That The</u>**
**<u>Trial Court Erroneously Allowed A Knife Into Evidence</u>**

    In Ground One, Petitioner contends that the trial court's admission
into evidence of a knife that was found in his possession, but not used
in the commission of his crimes, violated the Fourteenth Amendment's

------

    [2]  The Court may only consider new evidence obtained through an
evidentiary hearing if Petitioner satisfies 28 U.S.C. § 2254(e)(2).  <u>See</u>
<u>Cullen v. Pinholster</u>, ___ U.S. ___, 131 S. Ct. 1388, 1401, 179 L. Ed.
2d 557 (2011).  The Court finds that there is no need for an evidentiary
hearing to resolve these claims.

    [3]  The Supreme Court has held that "[i]f a claim has been
adjudicated on the merits by a state court, a federal habeas petition
must overcome the limitation of § 2254(d)(1) on the record that was
before that state court."  <u>Pinholster</u>, 131 S. Ct. at 1400.  Thus, the
Court cannot hold an evidentiary hearing on Petitioner's claim in Ground
Two.  <u>Id.</u> ("[E]vidence introduced in federal court has no bearing on §
2254(d)(1) review.").

1  Equal Protection Clause and California Evidence Code section 1101.
2  (Petition at 5).   According to Petitioner, "[t]he trial court is
3  suppose[d] to[] accept relevant evidence into trial instead of non
4  relevant [sic] evidence."  (Id.).  There is no merit to this claim.

5

6     As a preliminary matter, Petitioner's claim that the trial court
7  erred under state law by allowing the knife into evidence is not
8  cognizable on federal habeas review.  Estelle v. McGuire, 502 U.S. 62,
9  67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) ("[I]t is not the
10 province of a federal habeas court to reexamine state-court
11 determinations on state-law questions.").  Thus, the Court limits its
12 consideration of Petitioner's claim to the constitutional issue raised
13 in the Petition.  Because Ground One is not based on allegations of
14 discriminatory conduct in violation of the Equal Protection Clause, the
15 Court, pursuant to its duty to construe pro se pleadings filed by habeas
16 petitioners liberally, Zichko v. Idaho, 247 F.3d 1015, 1020 (9th Cir.
17 2001), interprets Petitioner's claim as a due process issue rather than
18 an equal protection issue.  As discussed below, under de novo review,
19 there is no merit to Petitioner's claim that the admission of the knife
20 violated his constitutional rights.

21

22     **1.    Background**

23

24     In its decision rejecting Petitioner's challenge to the admission
25 of the knife, the California Court of Appeal set forth the following
26 additional facts, which this Court presumes is correct.  28 U.S.C. §
27 2254(e)(1).

28

On September 18, 2006, [Petitioner] filed a motion to exclude a five-inch steak knife that was found on his person when he was arrested on August 10, 2005, as irrelevant and overly prejudicial. [Petitioner] claimed it was improper character evidence under Evidence Code section 1101, subdivision (a). The People filed a response, arguing the evidence was admissible under Evidence Code section 1101, subdivision (b), as evidence of his intent to kill, as well as common plan or scheme evidence. No oral hearing on the motion appears in the record although it appears such a hearing took place.

During trial, on September 20, 2006, the prosecutor advised the trial court that she was seeking to introduce the testimony of Riverside County Sheriff's Corporal Nelson Guzman, who was not on the prosecution's witness list. The police report had erroneously stated that another officer had recovered the knife from [Petitioner] when he was arrested, but it was actually Corporal Guzman who had found the knife on [Petitioner].

Defense counsel responded that the knife had no connection to the knife testified to in the instant case. The trial court responded, "Although we talked about this before, and her point was that at the time that he was arrested that he had a knife in his pocket, which is not something that the ordinary citizen walks down the street carrying. And in view of what had happened on the previous

17

two nights, the fact that he was again carrying a weapon, is circumstantial evidence of his violent conduct with weapons. And it's peripheral, but I think it's admissible."

Defense counsel asked to submit briefing on character evidence.  The trial court responded, "It's not character." Defense counsel disagreed, arguing that the fact he carried around a steak knife was only relevant to show his violent character.  The trial court then made a somewhat confusing ruling, stating, "I think it's just as permissible to bring out of somebody who is convicted, as to bring out somebody convicted of grand theft that was permissible.  I even allowed the misdemeanor in because it involves moral turpitude.  So, you're quite right.  But as far as what it really has to do with this case, you have to admit it's pretty peripheral, that he's lying about everything in this case because he stole a car in Texas.  [¶]   But, nevertheless, the jury is entitled to consider it and be allowed to--he'll also be allowed to consider this knife."[FN7]

> [FN7]  The trial court was apparently referring to the fact that Gutierrez was impeached with his prior convictions.

At trial, Corporal Guzman testified that he was on patrol in the City of Perris when he received a radio call that someone had brandished a knife at the Wal-Mart store in the area.  The person matched [Petitioner's] description, and

18

1    Corporal Guzman had been briefed earlier that [Petitioner]

2    was wanted for committing two stabbings.

3

4    Corporal Guzman found [Petitioner] walking down the

5    street.  Since Corporal Guzman thought [Petitioner] was going

6    to run, and because he believed [Petitioner] was armed, he

7    pointed his gun at [Petitioner] and told him to stop.

8    [Petitioner] was ordered to lie face down on the ground and

9    he did not attempt to run.  [Petitioner] was handcuffed and

10    the knife was found on his person.

11

12 (Lodgment 8 at 10-11).

13

14    **2.**    **The Erroneous Admission Of The Evidence Did Not Result In A**

15    **Violation Of Due Process**

16

17    The admission of evidence is not subject to federal habeas review

18 unless a specific constitutional guarantee is violated or the error is

19 of such magnitude that the result is a denial of the fundamentally fair

20 trial guaranteed by due process.  See Henry v. Kernan, 197 F.3d 1021,

21 1031 (9th Cir. 1999).  The erroneous admission of evidence violates due

22 process only where two circumstances are met:  (1) "there are no

23 permissible inferences the jury may draw from the evidence"; and (2) the

24 evidence is "of such quality as necessarily prevents a fair trial."

25 Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991) (internal

26 quotation marks omitted).

27

28

19

1    In the present case, a picture of the steak knife found on
2  Petitioner was used as an exhibit and admitted into evidence over
3  Petitioner's objection. (RT 200, 243). Because this knife was not the
4  same weapon used to attack the two victims in this case, (CT 202-03; RT
5  157-58), the jury could draw no permissible inferences about
6  Petitioner's crime from his possession of the knife, insofar as the
7  knife evidence was inadmissible to show Petitioner's propensity to
8  commit violence and to impeach his credibility. <u>See</u> Cal. Evid. Code §
9  1101(a) (prohibiting character evidence of a person if used "to prove
10 his or her conduct on a specified occasion"); <u>People v. Fritz</u>, 153 Cal.
11 App. 4th 949, 956, 62 Cal. Rptr. 3d 885 (2007) (prohibiting the
12 prosecution from impeaching the defendant's credibility with evidence
13 of prior misconduct if the defendant did not testify). Nevertheless,
14 the knife evidence was not "of such quality as necessarily prevents a
15 fair trial," <u>Jammal</u>, 926 F.2d at 920 (internal quotation marks omitted),
16 because the erroneous admission of the steak knife was harmless.

18    "[I]n reviewing state court decisions for harmless error in the
19 context of a habeas petition, federal courts review to determine if the
20 error had 'a substantial and injurious effect or influence in
21 determining the jury's verdict.'" <u>Slovik v. Yates</u>, 556 F.3d 747, 755
22 (9th Cir. 2009) (as amended) (quoting <u>Brecht v. Abrahamson</u>, 507 U.S.
23 619, 623, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)).[4] "In making this

25    [4] Although the California Court of Appeal, upon concluding that the
26 trial court erred in allowing the knife into evidence, applied a
   harmless error test for assessing state law evidentiary errors, this
27 Court must "apply the <u>Brecht</u> test without regard for the state court's
   harmlessness determination." <u>Pulido v. Chrones</u>, 629 F.3d 1007, 1012
28 (9th Cir. 2010). Regardless, the test for harmless error used by the

inquiry, the court must review the record to determine 'what effect the error had or reasonably may be taken to have had upon the jury's decision.'"   Id.

Here, the admission of the irrelevant steak knife did not have a substantial or injurious influence in determining the jury's verdicts because the evidence of Petitioner's guilt for attempted murder, assault with a deadly weapon, and attempted escape was overwhelming.   See Jackson v. Brown, 513 F.3d 1057, 1082 (9th Cir. 2008) (concluding that the erroneous admission of evidence did not render the petitioner's trial fundamentally unfair where evidence of the petitioner's guilt was "overwhelming"); Allen v. Woodford, 395 F.3d 979, 992 (9th Cir. 2005) (as amended) ("[T]o the extent that any claim of error . . . might be meritorious, we would reject that error as harmless because the evidence of [the petitioner's] guilt is overwhelming.").

With respect to Petitioner's attack on Gant (counts 1 and 2), Gant testified that he was at home in his garage smoking marijuana with Petitioner when Petitioner indicated that "somebody was looking for me." (RT 8-10).  Gant then observed Petitioner leave the garage.  (RT 14, 44-45).  Shortly thereafter, Gant felt someone strike him in the head.  (RT 14-15).  As Gant tried to protect himself, he testified that he saw Petitioner holding a wire splicer/cable knife, appearing "like in another world looking at [him] crazy." (RT 14-15, 26-27).  Petitioner told Gant to leave, and after Gant fled to his neighbor's house, he

California Court of Appeal was "the equivalent of the Brecht standard under federal law." Bains v. Cambra, 204 F.3d 964, 971 n.2 (9th Cir. 2000).

1  realized that he was bleeding and had wounds on his arm and neck.  (RT
2  15-16, 19-20).  He later observed Petitioner leave the garage and run
3  down the street after his neighbors chased Petitioner away.  (RT 17-18).
4  Gant received stitches at Moreno Valley hospital and then was sent to
5  Loma Linda hospital for treatment.  (RT 22-23, 26).  Dr. Jennifer Weik,
6  a general surgery resident at Loma Linda University, reviewed Gant's
7  medical records and testified that he sustained injuries to his cartoid
8  gland and had stab wounds in his neck in close proximity to his cartoid
9  artery.  (RT 201, 209, 211-13).  Based on the severity of Gant's neck
10 wounds, Petitioner must have intended to kill Gant when he struck him
11 with the wire splicer.  See People v. Bolden, 29 Cal. 4th 515, 561, 127
12 Cal. Rptr. 2d 802 (2002) ("In plunging the knife so deeply into such a
13 vital area of the body of an apparently unsuspecting and defenseless
14 victim, defendant could have had no other intent than to kill.").

15

16     With respect to Petitioner's attack on Gutierrez (counts 3 and 4),
17 Gutierrez testified that was waiting in his car to speak with
18 Petitioner's brother when Petitioner emerged from a trailer, approached
19 Gutierrez, and told him to leave.  (RT 114-17).  Gutierrez testified
20 that Petitioner returned to the trailer and, within fifteen seconds,
21 reemerged, whereupon he "stabbed [Gutierrez] as he threw the punch with
22 the knife."  (RT 120-21).  Gutierrez testified that although
23 Petitioner's hand hit the window of the car, Petitioner still managed
24 to stab him.  (RT 121).  Gutierrez testified that he "felt the blood
25 running down [his] neck right after [Petitioner] threw the blow."  (RT
26 121).  After blacking out for half a minute and fearing another attack,
27 Gutierrez immediately drove his car out of the area and into the parking
28 lot of a convenience store in order to seek help.  (RT 123-25).

1  Gutierrez testified that when he sought help inside the convenience
2  store, he noticed that the blade of Petitioner's knife had broken off
3  and was stuck a few inches inside his neck. (RT 126, 206). Gutierrez
4  later received stitches for his neck wound. (RT 128). The severity of
5  Gutierrez's injuries suggests Petitioner harbored an intent to kill when
6  he stabbed him. See Bolden, 29 Cal. 4th at 561.

8      With respect to Petitioner's attempted escape (count 5), Riverside
9  Sheriff's Deputy Richard Watkins testified that on August 17, 2005, he
10 was working at the Robert Presley Detention Center when he received a
11 call to release Arturo Tellez, who was housed in the same cell as
12 Petitioner. (RT 161-62, 164). Using the intercom system, Deputy
13 Watkins contacted Tellez's cell and asked, "Is this Tellez?" A voice
14 replied, "Yeah." (RT 165). Deputy Watkins told the individual to
15 gather his belongings in preparation for his release. (RT 165). Deputy
16 Watkins opened the cell door and met Petitioner outside Tellez's cell.
17 (RT 167). Petitioner had in his possession a property box with Tellez's
18 name on it. (RT 168). Although Petitioner did not have a wristband,
19 Deputy Watkins sent Petitioner to the release area. (RT 167-68).
20 Because Petitioner lacked a wristband and did not appear to match
21 Tellez's picture in an identification card, Deputy Watkins asked Deputy
22 Perry Sexson, the release officer, to verify Petitioner's identity. (RT
23 167, 171).

25     Deputy Sexon testified that after Petitioner and other inmates were
26 brought to the release area, he asked for Tellez, and Petitioner
27 responded, "That's me." (RT 184). Deputy Sexson testified that as
28 Petitioner changed into civilian clothing obtained from Tellez's

23

1   property bag, he noticed that Petitioner did not wear Tellez's shoes.
2   (RT 185).  When asked why, Petitioner "said that his feet had grown."
3   (RT 185).   Deputy Sexson then questioned Petitioner about Tellez's
4   personal information, such as Tellez's name, date of birth, last known
5   address, and emergency contacts. According to Deputy Sexson, Petitioner
6   "was only able to come up with the name and a date of birth.  Nothing
7   else." (RT 186). Deputy Sexon then asked Petitioner, "Okay, so who are
8   you?  Tell me your name."  Petitioner insisted he was Tellez, but upon
9   further questioning, he gave his true name to the deputy.  (RT 187).
10  When Deputy Sexson asked Petitioner why he presented himself as Tellez,
11  Petitioner merely "shrugged his shoulders."  (RT 187).  This evidence
12  clearly demonstrates that Petitioner impersonated Tellez and was able
13  to proceed to the release area before his ruse was discovered.

14

15      Given the overwhelming evidence of Petitioner's guilt, even if the
16  jury received an unfavorable perception of Petitioner on account of his
17  possession of a steak knife on the day of his arrest, this perception
18  did not have a substantial or injurious effect in influencing the jury's
19  verdicts.  Accordingly, Ground One fails under de novo review.

20

21  **B.**   **Petitioner Is Not Entitled To Habeas Relief On His Claim That The**
22       **Trial Court's Exclusion Of Certain Testimony Deprived Him Of His**
23       **Right To Present A Defense**

24

25      In Ground Two, Petitioner contends the trial court erroneously
26  excluded certain witness testimony in violation of article I, section
27  15 of the California Constitution and Petitioner's rights under the
28  Fourteenth Amendment.  (Petition at 5).

Preliminarily, the Court declines to address Petitioner's claim with respect to the trial court's purported violation of the California Constitution.  See McGuire, 502 U.S. at 67-68.  Instead, the Court focuses on the federal nature of Petitioner's claim.

Although Petitioner fails to specify in the Petition the precise testimony that the trial court erroneously excluded, this Court finds that, based on the California Court of Appeal's discussion of the issue, Petitioner's claim in Ground Two is premised on the trial court's purported exclusion of two potential defense witnesses who worked at Petitioner's detention facility:  Deputy Ferguson and an "Own Recognizance" ("O.R.") clerk.  (Lodgment 8 at 16-19).  As discussed below, the California Court of Appeal's rejection of Petitioner's constitutional claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, nor was it an unreasonable application of the facts.  28 U.S.C. § 2254(d).

## 1.    Background

In its decision rejecting Petitioner's claim that the trial court's exclusion of defense witnesses violated his right to present a defense, the California Court of Appeal set forth the following additional facts, which this Court presumes is correct.  28 U.S.C. § 2254(e)(1).

Prior to the defense case, defense counsel indicated that he had a proposed stipulation.  Defense counsel stated that he did not have Deputy Ferguson available to testify. Deputy Ferguson would have testified that Deputy Sexson never

25

1   told him that [Petitioner] had said he did not put on the

2   shoes because his feet had grown when he described the

3   incident to him.  The trial court felt this evidence was not

4   significant based on all the other statements that

5   [Petitioner] made identifying himself as Tellez.  Defense

6   counsel noted that one of the jurors had audibly laughed at

7   this testimony.  The trial court felt the witness was

8   unnecessary because Deputy Ferguson would not call Deputy

9   Sexson a liar, but would accept a stipulation from the

10  People.

12      The People were not willing to stipulate.  Deputy Sexson

13  had testified that he could not remember if he relayed that

14  statement to Deputy Ferguson.  The trial court ruled, "Okay.

15  I think that it's unnecessary, and it's un-[Evidence Code

16  section] 352. I think the probative value is zero and the

17  time consumption is prohibitive, so I would not allow that

18  witness to testify if he were standing in the hall."

20      The People then asked for an offer of proof for a

21  witness who was an Own Recognizance (OR) clerk at the jail.

22  [Petitioner] apparently spoke with her and could have

23  believed that he was being released.  The trial court felt

24  this evidence was irrelevant because if he thought he was

25  being released, he would have no reason to pretend to be

26  Tellez.  Defense counsel responded that it was possible that

27  [Petitioner], who was sleepy at 1:00 a.m., may have believed

28  he was being released.  The trial court excluded the witness

as irrelevant and inadmissible under Evidence Code section 352.

(Lodgment 8 at 16-17).

### 2.   Petitioner Was Not Deprived Of His Constitutional Right To Present A Defense

Criminal defendants have a constitutional right to present relevant evidence in their own defense. See, e.g., Holmes v. South Carolina, 547 U.S. 319, 324, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." (internal quotation marks omitted)). "However, a defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions, such as evidentiary and procedural rules." Moses v. Payne, 555 F.3d 742, 757 (9th Cir. 2009) (as amended) (internal quotation marks, brackets and citation omitted). Indeed, "[s]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." Holmes, 547 U.S. at 324 (internal quotation marks omitted); see also Moses, 555 F.3d at 757 ("[T]he Supreme Court has indicated its approval of well-established rules of evidence that permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." (internal quotation marks and brackets omitted)).

1    The exclusion of evidence pursuant to a state evidentiary rule is
2 unconstitutional only where it "significantly undermined fundamental
3 elements of the accused's defense." <u>United States v. Scheffer</u>, 523 U.S.
4 303, 315, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998); <u>see also</u> <u>Moses</u>, 555
5 F.3d at 757 ("Evidentiary rules do not violate a defendant's
6 constitutional rights unless they infringe upon a weighty interest of
7 the accused and are arbitrary or disproportionate to the purposes they
8 are designed to serve." (internal quotation marks and brackets
9 omitted)).   In sum, it takes "unusually compelling circumstances to
10 outweigh the strong state interest in administration of its trials."
11 <u>Moses</u>, 555 F.3d at 757 (internal quotation marks and ellipsis omitted).
12
13    On direct review, the California Court of Appeal applied the
14 following analysis in rejecting Petitioner's claim that his right to
15 present a defense was violated:
16
17        As for the supposed testimony from Deputy Ferguson, it
18    is apparent that [Petitioner] did not subpoena Deputy
19    Ferguson.   Rather, [Petitioner] wanted the prosecution to
20    accept his stipulation admitting the defense evidence.   There
21    was no exclusion of defense evidence as [Petitioner] had no
22    evidence to present.   Further, the People had no obligation
23    to agree to [Petitioner's] stipulation.   Defense counsel did
24    not request a continuance in order to secure Deputy
25    Ferguson's testimony.   As such, the trial court did not
26    deprive [Petitioner] of the opportunity to present his
27    defense when he had nothing to present.   Additionally, Deputy
28    Sexson had already testified that he was not sure if he

28

1    relayed the statement to Deputy Ferguson.  This evidence was
2    superfluous and did not deprive [Petitioner] of his right to
3    present a defense.

4

5         Furthermore, the exclusion of the OR clerk's testimony
6    was proper.  This evidence was clearly irrelevant based on
7    the fact that [Petitioner] had identified himself as Tellez,
8    not himself.  If he truly believed that he was subject to
9    release, there would be no reason to identify himself as
10   Tellez.  This evidence was simply irrelevant, speculative (in
11   that [Petitioner's] offer of proof was that he may have
12   believed he was actually being released), and it had no
13   evidentiary weight.  Since the evidence was irrelevant, it
14   could not deprive him of his right to present a defense.

15

16  (Lodgment 8 at 17-18).  The California Court of Appeal expressed valid

17  reasons for rejecting Petitioner's assertion of error.

18

19   First, the trial court's exclusion of Deputy Ferguson as a defense

20  witness (to the extent he was barred from testifying) did not deprive

21  Petitioner of his right to dispute the prosecution's key evidence, i.e.,

22  the fact that Petitioner, while impersonating Tellez, claimed that his

23  feet had "grown" when he could not wear Tellez's shoes.  The trial

24  court's order excluding Deputy Ferguson as a witness did not prohibit

25  Petitioner from asserting that no such statement was made.  Moreover,

26  Deputy Ferguson's testimony, assuming he would have testified in

27  accordance with defense counsel's offer of proof, was relevant only to

28  establish  that  Deputy  Sexson  did  not  tell  Deputy  Ferguson  of

1  Petitioner's explanation for declining to wear Tellez's shoes.  However,
2  Deputy Sexson testified that he did not recall informing Deputy Ferguson
3  of Petitioner's statement.  (RT 190-91).  Thus, the California Court of
4  Appeal reasonably concluded that Deputy Ferguson's proffered testimony
5  was superfluous.  As the purported exclusion of Deputy Ferguson's
6  testimony could not have "significantly undermined fundamental elements"
7  of Petitioner's defense, Petitioner has failed to demonstrate a
8  constitutional violation.  Scheffer, 523 U.S. at 315; see Musladin v.
9  Lamarque, 555 F.3d 830, 850 (9th Cir. 2009) (finding no violation of due
10  process over the exclusion of defense testimony because the state of the
11  evidence "would remain the same had the proffered testimony been
12  allowed").

14      Second, the trial court's exclusion of the O.R. clerk did not
15  violate Petitioner's right to present a defense.  Defense counsel
16  intended to introduce evidence that the O.R. clerk interviewed
17  Petitioner at some point prior to his attempted escape in order to
18  establish Petitioner's subjective belief that he was being released.
19  (RT 228-29).  However, defense counsel failed to present an offer of
20  proof in support of this proffered testimony nor did counsel attempt to
21  introduce the content of Petitioner's interview with the O.R. clerk.
22  (RT 228).  There is nothing to indicate that the O.R. clerk conveyed to
23  Petitioner he was entitled to be released, and it is purely speculative
24  to assume that Petitioner, by virtue of the fact that he interviewed
25  with the O.R. clerk at some point in time, genuinely believed that he
26  was allowed to leave the detention facility.  Under these circumstances,
27  the California Court of Appeal reasonably found that the exclusion of
28  the O.R. clerk did not violate Petitioner's constitutional right to

present a defense.   See Spivey v. Rocha, 194 F.3d 971, 978 (9th Cir. 1999) (finding that the exclusion of "purely speculative" evidence did not render the petitioner's trial fundamentally unfair); United States v. Rubio-Topete, 999 F.2d 1334, 1340 (9th Cir. 1993) (finding that the exclusion of "marginally relevant" and "highly speculative" evidence did not deprive the defendant of his right to present a defense).

The California Court of Appeal's rejection of Petitioner's claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, nor was it an unreasonable application of the facts.  28 U.S.C. § 2254(d).  Accordingly, Petitioner is not entitled to habeas relief on the claim asserted in Ground Two.

C.   **Petitioner Is Not Entitled To Habeas Relief On Claims Of Jury Instructional Error**

In Grounds Three, Four, and Five, Petitioner contends the trial court committed the following instructional errors, which, as previously discussed, the Court reviews de novo:

1.   The trial court failed to instruct the jury on simple assault, which violated Petitioner's Fourteenth Amendment rights to due process and equal protection, as well as article I, section 28 of the California Constitution (Ground Three).

2.   The trial court erroneously refused to give a self-defense instruction even after the prosecution presented a statement

31

1    from Petitioner explaining that he stabbed Gutierrez in self-
2    defense, which resulted in a violation of Petitioner's
3    Fourteenth Amendment right to equal protection (Ground Four).

5    3.    The trial court erroneously gave a flight instruction despite
6          the lack of evidence justifying the instruction, which "put
7          inside a juror's head a possible consciousness of guilt,"
8          resulting in an unreliable guilty verdict in violation of the
9          Fourteenth Amendment (Ground Five).

11   (Petition at 6).

13   To the extent that Petitioner's claim of instructional error in
14   Ground Three raises issues of state law, this claim is not cognizable
15   on federal habeas review. McGuire, 502 U.S. at 67-68; see 28 U.S.C. §
16   2254(a) (permitting a state prisoner to obtain habeas relief "only on
17   the ground that he is in custody in violation of the Constitution or
18   laws or treaties of the United States"). Thus, the Court declines to
19   address Petitioner's claim in Ground Three as it pertains to a purported
20   violation of the California Constitution.

22   As for the federal component of Petitioner's claims, if
23   instructional error is alleged, habeas relief is warranted only if the
24   error by itself so infected the entire trial that the resulting
25   conviction violates due process. See Waddington v. Sarausad, 555 U.S.
26   179, 191, 129 S. Ct. 823, 172 L. Ed. 2d 532 (2009). Where the alleged
27   error is the failure to give an instruction, the burden on the
28   petitioner is "especially heavy." Henderson v. Kibbe, 431 U.S. 145,

155, 97 S. Ct. 1730, 52 L. Ed. 2d 203 (1977) ("An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."). "The significance of the omission of such an instruction may be evaluated by comparison with the instructions that were given." Id. at 156. Even if an error occurred in instructing the jury, habeas relief will be granted only if the petitioner can establish that the error had a substantial and injurious effect or influence in determining the jury's verdict. Hedgpeth v. Pulido, 555 U.S. 57, 61-62, 129 S. Ct. 530, 172 L. Ed. 2d 388 (2008) (per curiam); Brecht, 507 U.S. at 637.

1.   **Ground Three:  The Failure To Instruct On Simple Assault**

Petitioner's claim in Ground Three derives from the trial court's failure to sua sponte instruct the jury on simple assault, which Petitioner argues is a lesser-included offense of assault with a deadly weapon. (Petition at 6; see Lodgment 5 at 35). There is no merit to this claim, even under de novo review.

In its review of Petitioner's claim, the California Court of Appeal concluded that under California law, the trial court was not required to give a simple assault instruction based on the following:

> Here, the instruction on simple assault was not warranted by the evidence. [Petitioner] used a wire splicer against Gant and a knife against Gutierrez. In both instances, he intentionally stabbed the victims in the neck with these items. There was virtually no evidence that

33

[Petitioner] committed a simple assault or that [Petitioner] assaulted his victims without the use of a deadly weapon. Despite [Petitioner's] claim to the contrary, the jury could not have found these weapons to be less than deadly weapons. The record contains evidence that proved defendant guilty of only the greater offense. [People v. Richmond, 2 Cal. App. 4th 610, 618, 3 Cal. Rptr. 2d 252 (1991).] "There was no substantial evidence for the view [Petitioner] now offers, i.e., evidence from which a jury composed of reasonable persons could conclude that the lesser offense, but not the greater, was committed." [People v. Huggins, 38 Cal. 4th 175, 217, 41 Cal. Rptr. 3d 593 (2006).] Therefore, an instruction on the lesser offense of simple assault was not required.

(Lodgment 8 at 21).

To the extent that Petitioner's claim of jury instructional error is based solely on issues of state law, this claim would not be cognizable on federal habeas review. McGuire, 502 U.S. at 67-68; Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005) ("Any error in the state court's determination of whether state law allowed for an instruction in this case cannot form the basis for federal habeas relief.").

Moreover, to the extent Petitioner's claim in Ground Three is derived from a violation of the United States Constitution, although the Supreme Court has held that in capital cases the failure to sua sponte

34

1   instruct the jury on a lesser included offense is constitutional error
2   if there is evidence to support the instruction, <u>Beck v Alabama</u>, 447
3   U.S. 625, 638, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980), the Supreme
4   Court has not extended this rule to non-capital cases. <u>See</u> <u>id.</u> at 638
5   n.14. Notably, although courts have found that "the failure of a state
6   trial court to instruct on lesser included offenses in a non-capital
7   case does not present a federal constitutional question," <u>Windham v.</u>
8   <u>Merkle</u>, 163 F.3d 1092, 1106 (9th Cir. 1998), the Ninth Circuit has also
9   found that a trial court's refusal of a defense request "to instruct a
10  jury on lesser included offenses, when those offenses are consistent
11  with defendant's theory of the case, may constitute a cognizable habeas
12  claim." <u>Solis v. Garcia</u>, 219 F.3d 922, 929 (9th Cir. 2000).

13

14  Because no Supreme Court decision has imposed a <u>sua sponte</u> duty to
15  instruct on lesser-included offenses in non-capital cases, Petitioner's
16  claim of error does not, by itself, establish constitutional error.
17  Instead, to be a cognizable basis for federal habeas relief, the claimed
18  instructional error must have "so infected the entire trial that the
19  resulting conviction violates due process." <u>Sarausad</u>, 555 U.S. at 191
20  (internal quotation marks omitted) Where the alleged error is premised
21  on the mere failure to give an instruction, the burden on the petitioner
22  is "especially heavy." <u>Kibbe</u>, 431 U.S. at 155.

23

24  Here, Petitioner cannot meet his heavy burden of proving that the
25  trial court's failure to instruct the jury on simple assault infected
26  the entire trial with such unfairness that his right to due process was
27  violated. Because Petitioner did not request a simple assault
28  instruction, (<u>see</u> RT 252-53), his claim of error is necessarily

35

attributed to the trial court's failure to sua sponte instruct the jury
on simple assault, which is defined by the California courts as a
lesser-included offense of assault with a deadly weapon. People v.
Gomez, 192 Cal. App. 4th 609, 613, 121 Cal. Rptr. 3d 475 (2011). Under
California law, a trial court's duty to sua sponte instruct on a lesser-
included offense arises only if there is "substantial evidence that [a]
defendant committed assault but not assault with a deadly weapon."
People v. Page, 123 Cal. App. 4th 1466, 1474, 20 Cal. Rptr. 3d 857
(2004).

   In the present case, substantial evidence was not presented
demonstrating that Petitioner could only be found guilty of simple
assault.  The fact that Petitioner's wire splicer and knife were able
to pierce each of his victims in the neck suggests these items were
dangerous weapons. See People v. Golde, 163 Cal. App. 4th 101, 116, 77
Cal. Rptr. 3d 120 (2008) (finding that an automobile used to run over
a person had to have been a dangerous weapon); Page, 123 Cal. App. 4th
at 1471-74 (finding that a pencil used to stab the victim in the neck
was a deadly weapon as a matter of law).  Because "it is ludicrous to
suggest on this record" that Petitioner could be found guilty of simple
assault after stabbing his victims with a wire splicer and knife, "the
trial court did not err in failing to instruct on simple assault as a
lesser included offense." Golde, 163 Cal. App. 4th at 116-17.  In
short, given the nature of Petitioner's weapons and the manner in which
they were used, Petitioner's attacks could not be fairly characterized
as simple assault as opposed to an assault with a deadly weapon.  Thus,
the trial court's failure to instruct on simple assault did not violate
due process. See Menendez, 422 F.3d at 1029-30 (holding that a state

court's decision to refrain from instructing on a lesser-included offense was not erroneous, let alone a due process violation, if state law would not have allowed the instruction). Accordingly, Ground Three fails under de novo review.

**2.   Ground Four:  The Refusal Of A Self-Defense Instruction**

In Ground Four, Petitioner contends the trial court erroneously refused his request for a self-defense instruction because Petitioner's statement to a sheriff's deputy that he stabbed Gutierrez in self-defense "justified a self[-]defense instruction." (Petition at 6).  As argued by Petitioner, the trial court's error violated his Fourteenth Amendment right to equal protection. (Id.).  This claim fails under de novo review.

At trial, defense counsel requested a self-defense instruction for counts 3 and 4 based on the prosecution's introduction of an admission from Petitioner stating that he stabbed a person in self-defense when that person hit him in the head. (RT 251).  The trial court refused this request because the court believed Petitioner's out-of-court statement was "self-serving," and there was no evidence "that any reasonable person could find" evidence to support self-defense. (RT 251-52).  The California Court of Appeal disagreed with the trial court, finding that "there was evidence presented to support an instruction on reasonable self-defense," and that "the trial court erred by failing to instruct the jury on reasonable self-defense as a defense to the charges involving Gutierrez." (Lodgment 8 at 28).  As explained by the court of appeal, "[Petitioner] told officers that a man broke into his RV and

37

started attacking him.  The man then hit [Petitioner] over his head with a bottle.  In order to protect himself, he grabbed a knife and stabbed the man in the neck. . . . [I]f believed, this constituted reasonable self-defense . . . . [Petitioner] was being attacked in his home and responded with appropriate force."  (Id. at 23 (citation omitted)). Nevertheless, the appellate court concluded that the trial court's error was harmless beyond a reasonable doubt.  (Id. at 29).

Without deciding whether Petitioner was entitled to a self-defense instruction under California law, the Court concludes that even if the trial court erred, such error did not have a "substantial and injurious effect or influence in determining the jury's verdicts" with respect to Petitioner's crimes against Gutierrez.  Bradley v. Duncan, 315 F.3d 1091, 1099 (9th Cir. 2002) (applying the Brecht harmless error test where the trial court refused to instruct the jury on a defense).  The only evidence in support of Petitioner's self-defense claim consisted of an out-of-court statement from Petitioner given to Riverside County Sheriff's Deputy Paul Sandoval during an interview discussing the attack on Gutierrez.  (RT 74-75).  According to Deputy Sandoval,

> [Petitioner] said he was asleep in his motorhome, said somebody entered his motorhome and assaulted him while he was asleep.  He woke up, started fighting with an individual. While he was fighting with the individual, the individual he said, he was beating him so bad, the individual, told him to stop.  He said the individual hit him over the head with a bottle, and at that particular point where he was in a fight

38

1    with the individual, he stabbed him to the left side of his
2    neck or stabbed him in the neck.

3

4    (RT 75).  Petitioner did not identify Gutierrez as his assailant and he
5    told Deputy Sandoval that he "didn't recognize him, didn't know who he
6    was."   (RT 76).   Not only was there a complete absence of direct
7    evidence implicating Gutierrez as Petitioner's purported assailant,
8    Petitioner's statement to Deputy Sandoval lacked specifics or
9    corroboration from any witnesses, least of all Petitioner himself.  As
10   a result, the jury would not likely have used Petitioner's interview
11   statement to justify his attack on Gutierrez.

12

13   Furthermore, Deputy Sandoval's observations of Petitioner the day
14   after he claimed he was attacked conflicted with Petitioner's story,
15   because the deputy did not observe any cut marks, scratches, or bruises
16   on Petitioner.   (RT 75-76).   Moreover, the evidence supporting
17   Petitioner's claim of self-defense was weak in relation to the strong
18   evidence put forth by the prosecution demonstrating that Petitioner, and
19   not Gutierrez, initiated an unprovoked attack.  See Duckett v. Godinez,
20   67 F.3d 734, 746 (9th Cir. 1995) (holding that the failure to give an
21   alibi instruction did not deprive the petitioner of due process because
22   his "alibi evidence was relatively weak in relation to the prosecution's
23   case").  Given the overwhelming evidence of Petitioner's culpability in
24   attacking Gutierrez, the failure to give a self-defense instruction was
25   harmless error.  See Morales v. Woodford, 388 F.3d 1159, 1173 (9th Cir.
26   2003) ("Mere speculation is insufficient to grant the writ under Brecht,
27   because speculation does not give rise to a 'grave doubt' whether the
28

39

1  error had a substantial effect in determining the jury's verdict.").
2  Accordingly, Ground Four fails under <u>de novo</u> review.

3
4      **3.    Ground Five:  The Giving Of A Flight Instruction**

5
6      In Ground Five, Petitioner contends the trial court erred in
7  instructing the jury with CALCRIM No. 372 because "[t]here was no
8  evidence what so ever [sic] that would justify giving a flight
9  instruction."  (Petition at 6).  Citing the Fourteenth Amendment,
10  Petitioner argues the flight instruction "put inside a juror's head a
11  possible con[s]ciousness of guilt which would result in an unreliable
12  verdict of guilt."  (<u>Id.</u>).  This claim fails under <u>de novo</u> review.

13
14      At trial, defense counsel argued to the trial court that a "flight"
15  instruction was unwarranted because there was no evidence that
16  Petitioner fled after committing his crimes.  (RT 247).  The trial court
17  observed that Petitioner's absence following the commission of his
18  crimes could be interpreted as evidence that he fled the scene.  (RT
19  247-48).  The jury was subsequently given the following flight
20  instruction from CALCRIM No. 372:

21
22          If [Petitioner] fled immediately after the crime was
23      committed, that conduct may show that he was aware of his
24      guilt.  If you conclude that [Petitioner] fled, it's up to
25      you to decide the meaning and importance of that conduct;
26      however, evidence that [Petitioner] fled cannot prove guilt
27      by itself.

28

1   (RT 289; CT 249).  The California Court of Appeal did not directly
2   address whether sufficient evidence supported the use of the flight
3   instruction.  Instead, the appellate court found that even if the
4   instruction was erroneously given, the error was harmless. (Lodgment
5   8 at 27).  The court noted that because the flight instruction allowed
6   the jury to infer Petitioner's consciousness of guilt only if it found
7   sufficient evidence that Petitioner did indeed flee the scene, "[i]f
8   there was insufficient evidence of flight, we may safely assume that the
9   jury made no use of the instruction."  (Id.).

10

11       Under California law, a flight instruction "is proper where the
12   evidence shows that the defendant departed the crime scene under
13   circumstances suggesting that his movement was motivated by a
14   consciousness of guilt."  People v. Ray, 13 Cal. 4th 313, 345, 52 Cal.
15   Rptr. 2d 296 (1996); see Cal. Penal Code § 1127c (requiring a flight
16   instruction if the prosecution relies on the defendant's flight to show
17   guilt).  Without deciding whether the evidence presented at trial
18   warranted a flight instruction,[5] the Court concludes that the trial
19   court's use of CALCRIM No. 372 did not have a substantial and injurious
20   effect or influence in determining the jury's verdicts.  See Pulido, 555
21   U.S. at 61-62.

22

23

_____

24       [5] There was some evidence that Petitioner fled after attacking
25   Gant, in that Gant testified he observed Petitioner running down the
     street after his neighbors chased Petitioner out of his house after
26   Petitioner's attack.  (RT 17-18).  However, there was arguably no
     evidence of Petitioner fleeing following his attack on Gutierrez, as the
27   only evidence presented on this point was Deputy Sandoval's observation
     that he did not encounter Petitioner when he visited the location of
28   Gutierrez's attack.  (RT 67, 70, 73).

                                    41

1       First, the wording of CALCRIM No. 372 properly admonished the

2  jurors not to base a finding of guilt on Petitioner's flight alone.

3  Because the jury is presumed to have followed this instruction, Weeks

4  v. Angelone, 528 U.S. 225, 234, 120 S. Ct. 727, 145 L. Ed. 2d 727 (2000)

5  ("A jury is presumed to follow its instructions"), the jury's decision

6  to convict Petitioner was not derived entirely from its assessment of

7  Petitioner's flight.   Rather, compelling evidence showing that

8  Petitioner initiated unprovoked attacks on Gant and Gutierrez likely

9  formed the basis for the jury's verdicts, and evidence of Petitioner's

10  flight played an insubstantial role in determining the outcome, if at

11  all.  See Morales, 388 F.3d at 1172 ("The evidence was so overwhelming

12  that the constitutional error cannot be said to have had an effect upon

13  the verdict in the case at hand.")

14

15      Second, CALCRIM No. 572 prohibited the jury from inferring

16  Petitioner's consciousness of guilt absent evidence that he fled

17  immediately after the crimes were committed.  The jury was instructed

18  to "[p]ay careful attention to all these instructions and consider them

19  together. . . . Some of these instructions may not apply, depending on

20  your finding as to the facts of the case."  (RT 280; CT 231).  If, as

21  claimed by Petitioner, there was no evidence that he fled the scene, the

22  jury would have disregarded the flight instruction.  See Pulido, 629

23  F.3d at 1015 (noting that a jury likely did not use an inapplicable jury

24  instruction where the trial court instructed the jury to "'[d]isregard

25  any instruction which applies to facts determined by you not to

26  exist'").  In short, the reading of CALCRIM No. 572 to the jury did not

27  play a substantial or injurious role in shaping the jury's decision to

28

convict Petitioner.  There was no due process violation.  See Sarausad, 555 U.S. at 191.  Accordingly, Ground Five fails under de novo review.

## VII.

### CONCLUSION

IT IS ORDERED that: (1) the Petition is DENIED; and (2) Judgment shall be entered dismissing this action with prejudice.

DATED: September 15, 2011

                                   /S/
                          _____
                          SUZANNE H. SEGAL
                          UNITED STATES MAGISTRATE JUDGE

43